# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40803-2013

STATE OF IDAHO,                              )
                                             )       **Boise, December 2014 Term**
        Plaintiff-Respondent,                )
                                             )       **2015 Opinion No. 10**
v.                                           )
                                             )       **Filed: January 26, 2015**
DAVID AARON KNUTSEN,                         )
                                             )       **Stephen W. Kenyon, Clerk**
        Defendant-Appellant.                 )
                                             )

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, in and for Twin Falls County.  Hon. G. Richard Bevan, District Judge.

The judgment of the district court is <u>affirmed</u>.

Ben McGreevy, Deputy State Appellate Public Defender, Boise, argued for appellant.

Kenneth K. Jorgensen, Deputy Attorney General, Boise, argued for respondent.

_____

EISMANN, Justice.

This is an appeal out of Twin Falls County from a jury verdict finding the defendant guilty of four counts of sexual abuse of a vulnerable adult.  The defendant contends that the term of the grand jury that indicted him had already expired, that the statute defining the crimes is unconstitutional, that there was insufficient evidence to support the jury's verdict, and that his conviction should be for only one count because his conduct constituted one continuous act.  We affirm the judgment of the district court.

## I.
## Factual Background.

The victim entered a psychiatric hospital on January 30, 2009, and David Aaron Knutsen (Defendant), who was thirty-one years old, was already at the facility.  The victim, who was a twenty-two-year-old woman with a full-scale IQ of 72, had been admitted to the hospital because

she was depressed and suicidal. Defendant had checked himself into the hospital for thirty-six hours to have his medication adjusted.

When the victim was admitted into the hospital, she was given hospital scrubs to wear. She went to the TV room to watch television, and Defendant was in the room. After a few minutes she left and returned to her room because the way Defendant was staring at her made her feel uncomfortable. She ate supper in the cafeteria and returned there sometime around 7:00 p.m. for an 8:00 p.m. group session.

There was a hallway between the cafeteria and the nursing station, but the cafeteria had an open door and windows so that most of it could be observed from the nursing station. The victim sat down at a table with her back to the windows, and Defendant came over and sat across the table from her, facing the windows. He asked her if she was still a virgin, and she answered that she was. He asked her if she was wearing a bra, and she said she was not. He commented about how large her breasts were and asked how big her nipples were. She showed him with her fingers because she was scared and did not know what to do. He asked if he could feel her breasts and moved closer to her. Although she knew that was wrong, she said "Yes" because she was scared. He then felt her breast under her shirt. He was not wearing shoes, and he used his foot to push her legs apart and rub her genitals with his foot. He asked if he could see her vagina, and she testified that she said "Yes" because she was scared out of her mind. While the victim was at the table, Defendant was constantly watching the nursing station through the windows and looking around watching for anyone who may see them. He then took her to another part of the cafeteria near the soda fountain, which could not be seen from the nursing station. She was using a walker to ambulate because she had previously fallen on the ice and broken her ankle. When they arrived at that part of the cafeteria, she was standing with her back to the wall, and he was standing in front of her with the walker between them. He asked her to pull down her pants so that he could see her vagina. She complied, and he then said to pull them up because he was afraid someone would walk in. Near that area, there was a glass door with windows on each side, which provided access to exercise equipment and a small park. After she pulled her pants up, he touched her between the legs and touched her breasts. He also had her touch his penis on the outside of his pants. As the victim was leaving, he told her to wait. When she stopped and turned around, he touched her breasts and vagina again and then told her he was going to "jack off." The victim testified that she did not know what that meant. Defendant left

2

the facility the next day, and after he left the victim reported what had happened to one of the nurses.

On March 25, 2009, a grand jury returned an indictment charging Defendant with four counts of the felony crime of Sexual Abuse of a Vulnerable Adult. The alleged criminal conduct was: touching the victim's genitals with his foot, touching her genitals with his hand, touching her breasts with his hand(s), and having the victim touch his genitals with her hand. He was tried for the offenses before a jury on May 5 and 6, 2010, and it returned a verdict finding him guilty of all four charges. For each of the offenses, the district court sentenced Defendant to twenty-five years in the custody of the Idaho Board of Correction, with eighteen years fixed and the remaining seven years indeterminate. The court ordered that the four sentences be served concurrently, but that they be served consecutively to Defendant's prior sentence for lewd conduct with his seven or eight-year-old cousin. Defendant timely appealed.

## II.
### Had the Grand Jury's Term Expired Before Returning the Indictment?

Article I, § 8, of the Idaho Constitution provides that "[n]o person shall be held to answer for any felony or criminal offense of any grade, unless on presentment or indictment of a grand jury or on information of the public prosecutor." In this case, Defendant was prosecuted based upon an indictment. He contends that the grand jury's term had expired before it returned the indictment. An indictment issued by a grand jury whose term has expired is void. *State v. Lute*, 150 Idaho 837, 840, 252 P.3d 1255, 1258 (2011). If the indictment is void, the trial court does not acquire subject-matter jurisdiction over the crimes charged in the indictment. *Id*. at 841, 252 P.3d at 1259.

Upon the motion of the prosecuting attorney, the district court issued an order on November 13, 2008, for the impaneling of a grand jury. The order stated that "once selected and convened, the grand jury shall serve a term of four months until discharged by the Court, and during its term shall meet from time to time as necessary to conduct its business." The prospective jurors appeared on November 14, 2008, and the court informed them that "[t]his term of the grand jury is set for approximately four months"; that they would normally be meeting every other Wednesday; and that "the schedule for your four-month term and the dates when you should be available" were specific days commencing on December 3, 2008, and

3

ending on March 25, 2009. Sixteen jurors were then selected and impaneled as the grand jury. The grand jury met for the first time to inquire into a public offense on December 3, 2008, and it returned the indictment against Defendant on March 25, 2009.

Defendant was arrested on March 27, 2009, and he appeared in court to be arraigned on the indictment on March 30, 2009. The matter was continued at Defendant's request to July 20, 2009, at which time he entered pleas of not guilty to all four charges. On August 21, 2009, Defendant moved to dismiss the indictment on various grounds including that the grand jury's term had expired before it issued the indictment. The district court held that it had not. The court ruled that the order stated that the grand jury's term would be four months "once selected and convened"; that the grand jury was first convened on December 3, 2008; and that the four-month period from that date had not expired by March 25, 2009.

On appeal, Defendant contends that the grand jury was convened on November 14, 2008, the day the jurors were impaneled, not on December 3, 2008, the day it first met in session to perform its statutory duty as a grand jury of "inquir[ing] into all public offenses committed or triable within the county." I.C. § 19-1101.

The maximum period of time that a grand jury may serve is set by Rule 6.8 of the Idaho Criminal Rules, which provides, "A grand jury shall serve until discharged by the court but no grand jury shall serve more than six (6) months unless specifically ordered by the court which summoned the grand jury." The district court had the authority to establish the term of the grand jury within the confines of Rule 6.8. It ordered that the grand jury's term would be four months "once selected and convened." The court interpreted its order to mean that the grand jury term commenced the first time the grand jury convened to inquire into a public offense (December 3, 2008), which was consistent with what it informed the grand jury regarding the schedule of the grand jury sessions. The district court did not err in holding that the grand jury's term had not expired when it indicted Defendant on March 25, 2009.

### III.
### Did the District Court Err in Holding that Idaho Code Section 18-1505B Is Not Unconstitutionally Vague?

Prior to the trial, Defendant filed a motion to dismiss the indictment on the ground that Idaho Code section 18-1505B was unconstitutionally vague, both on its face and as applied to

4

him. He contended that the statute failed to give adequate notice to people of ordinary intelligence of the conduct that was proscribed. The district court denied the motion, holding that the statute was plain and unambiguous and that its plain meaning provides fair notice to citizens as to the conduct proscribed.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[T]he more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' " *Id*. at 358.

The statute criminalizes certain sexual contact with a vulnerable adult. There is no contention that the type of conduct criminalized under the statute is vague. The contention is that the definition of a "vulnerable adult" is vague. The statute defines a "vulnerable adult" as a person eighteen years of age or older "who is unable to protect himself from abuse, neglect or exploitation due to physical or mental impairment which affects the person's judgment or behavior to the extent that he lacks sufficient understanding or capacity to make or communicate or implement decisions regarding his person, funds, property or resources." I.C. §§ 18-1505B(2)(d), 18-1505.[1]

Defendant contends that the definition of a vulnerable adult is too indefinite to support a criminal charge, but he does not point to any portion of the statute that is allegedly vague or lacks sufficient minimal guidelines to govern law enforcement. Instead, he argues that there are some circumstances where the statute should not be applied. A criminal defendant that engages in conduct that is clearly proscribed by the statute cannot complain that it may be vague as applied to the conduct of others. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19-20 (2010). A more stringent standard does apply if the statute interferes with the right of free speech or of association. *Id*. at 19. Defendant does not contend that the statute interferes with the right of free speech, but he does contend that it interferes with the right of association. As

---

[1] In defining the crime, Idaho Code section 18-1505B(2)(d) incorporates the definition of vulnerable adult set forth in Idaho Code section 18-1505.

will be addressed below in connection with his argument that the statute is overbroad, it does not interfere with the right of association.

In *Anderson v. Morrow*, 371 F.3d 1027 (9th Cir. 2004), the court addressed whether an Oregon rape statute was unconstitutionally vague. The statute declared sexual intercourse with another person to be the felony crime of rape if "[t]he victim is incapable of consent by reason of mental defect." Or. Rev. Stat. § 163.375(1)(d). The court rejected the argument that the statute was not sufficiently precise to provide comprehensible notice, stating, "The sex crimes statute is clear on what it prohibits: sexual intercourse with a person 'incapable of consent by reason of mental defect.'" 371 F.3d at 1032. The court also stated that the statute "gives law enforcement officials clear standards on conduct that must be prosecuted." *Id.*

Section 18-1505B(2)(d) provides greater guidelines as to what conduct is prohibited than did the Oregon statute in *Anderson*. With respect to this case, a vulnerable adult is someone "who is unable to protect himself from abuse . . . due to . . . mental impairment." In addition, the mental impairment must "affect[] the person's judgment or behavior to the extent that he lacks sufficient understanding or capacity to make or communicate or implement decisions regarding his person, funds, property or resources." The statute gives adequate notice of the prohibited conduct and sufficient guidelines to govern law enforcement. The district court did not err in denying the motion to dismiss on the ground that the statute was unconstitutionally vague on its face.

Defendant contends that the statute is vague as applied to him because he could be held liable under the statute even though he had a reasonable belief that the victim did not meet the definition of a vulnerable adult. Defendant did not testify at the trial, so there is no evidence that he was in fact mistaken as to the mental competency of the victim. Therefore, there is nothing to support the assertion that he reasonably believed that the victim was not a vulnerable adult.

## IV.
### Did the District Court Err in Holding that Idaho Code Section 18-1505B Is Not Unconstitutionally Overbroad?

In his pretrial motion, Defendant also asserted that Idaho Code section 18-1505B was overbroad because it restricted adults "from carrying out their constitutionally guaranteed right to engage in sexual activity." The district court rejected that challenge, stating that "there is no

constitutional right to have sexual relations with a person who is incapable of providing consent." Defendant argues that the statute is overbroad because it interferes with his right of association.

The Supreme Court has held that the right of association includes two aspects: (a) protecting the freedom to enter into certain intimate human relationships against undue intrusion by the state, and (b) protecting the right to associate for the purpose of engaging in conduct protected by the First Amendment to the Constitution. *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). Relying upon *Lawrence v. Texas*, 539 U.S. 558 (2003), Defendant argues that Idaho Code section 18-1505B is overbroad because it infringes upon his right to have consensual sex with an adult. *Lawrence* does not prohibit criminalizing the sexual conduct in this case.

The petitioners in *Lawrence* had been engaging in homosexual sexual conduct in the private residence of one of them, which was the apartment where he resided. *Id*. at 562-63. Justice Kennedy commenced the majority opinion by stating, "Liberty protects the person from unwarranted government intrusions into a *dwelling or other private places*." *Id*. at 562 (emphasis added). He characterized the issue in the case as follows, "We conclude the case should be resolved by determining whether the petitioners were free as adults to engage in the *private conduct* in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Id*. at 564 (emphasis added). In his analysis, Justice Kennedy stated, "The case does involve two adults who, with full and *mutual consent* from each other, engaged in sexual practices common to a homosexual lifestyle. . . . The State cannot demean their existence or control their destiny by making their *private sexual conduct* a crime." *Id*. at 578 (emphases added). Justice Kennedy concluded his analysis by stating, "The Texas statute furthers no legitimate state interest which can justify its intrusion into the *personal and private life* of the individual." *Id*. (emphasis added).

Justice Kennedy expressly stated that the case "does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct . . . ." *Id*. The present case does not involve private conduct between two adults, with full and mutual consent from each other, who engaged in sexual practices common to a homosexual lifestyle.

7

First, Defendant's conduct did not occur in a dwelling or other private place. It occurred in the hospital cafeteria, part of which could be viewed from the nursing station by looking through an open door or the windows next to the door. While sexually abusing the victim when she was sitting at the table, Defendant was constantly watching the nursing station and looking around to avoid being caught. Then Defendant had the victim go to a part of the cafeteria near the pop machines that could not be viewed from the nursing station, near the door to the exercise equipment and a small park. After having the victim pull down her pants to expose her vagina, he told her to quickly pull them back up because he was afraid someone would come in that door. In addition, the nursing staff walks the halls and checks the patients every fifteen minutes.

Second, the sexual conduct in this case was not between two adults with full and mutual consent from each other. Although the victim was an adult, as a matter of law she was unable to consent to the sexual conduct. Even though the word "consent" is not in the statute, it is a legislative determination that vulnerable adults as defined in the statute are unable to consent to the sexual conduct described in the statute. For example, even though the word "consent" does not appear in the applicable statutory language, this Court has held that the victim of what is commonly called statutory rape cannot consent to the sexual intercourse, *State v. Herr*, 97 Idaho 783, 787, 554 P.2d 961, 965 (1976); that consent is not a defense to the crime of lewd conduct with a child under sixteen, *State v. Schwartzmiller*, 107 Idaho 89, 94, 685 P.2d 830, 835 (1984); and that consent is not a defense to the crime of sexual battery of a child sixteen or seventeen years of age, *State v. Oar*, 129 Idaho 337, 340, 924 P.2d 599, 602 (1996). The basis of those holdings was that such children are, as a matter of law, unable to consent to the proscribed sexual conduct. *See Herr*, 97 Idaho at 787, 554 P.2d at 965 ("[W]e agree with the trial court and hold that since a child under sixteen cannot as a matter of law give her consent, fornication cannot be a necessarily included offense of lewd conduct with a minor under sixteen."). In enacting Idaho Code section 18-1505B, the legislature defined a specific group of adults who, as a matter of law, are unable to consent to the proscribed sexual conduct.

Finally, Idaho Code section 18-1505B is not lacking a legitimate state interest. The State has a legitimate interest of protecting from sexual abuse those adults who are unable to protect themselves from abuse, neglect, or exploitation due to physical or mental impairment.

The Supreme Court in *Lawrence* simply wanted to legalize "sexual practices common to a homosexual lifestyle" that occurred in private between consenting homosexuals. It did not

create a fundamental right to engage in sexual conduct. As stated by the Seventh Circuit Court of Appeals:

> Given, therefore, the specific focus in *Lawrence* on homosexual sodomy, the absence from the Court's opinion of its own "established method" for resolving a claim that a particular practice implicates a fundamental liberty interest, and the absence of strict scrutiny review, we conclude that *Lawrence* did not announce a fundamental right of adults to engage in all forms of private consensual sexual conduct.

*Muth v. Frank*, 412 F.3d 808, 818 (7th Cir. 2005). Likewise, the Eleventh Circuit Court of Appeals has held that "the [Supreme] Court has never indicated that the mere fact that an activity is sexual and private entitles it to protection as a fundamental right." *Williams v. Attorney General of Ala.*, 378 F.3d 1232, 1236 (11th Cir. 2004). As that court also held, "[A]lthough *Lawrence* clearly established the unconstitutionality of criminal prohibitions on consensual adult sodomy, 'it is a strained and ultimately incorrect reading of *Lawrence* to interpret it to announce a new fundamental right'—whether to homosexual sodomy specifically or, more broadly, to all forms of sexual intimacy." *Id.*

Idaho Code section 18-1505B does not proscribe any constitutionally protected conduct. The district court did not err in holding that "there is no constitutional right to have sexual relations with a person who is incapable of providing consent."

## V.
### Does Idaho Code Section 18-1505B Violate the Equal Protection Clause of the Constitution?

Defendant contends that Idaho Code section 18-1505B violates the Equal Protection Clause of the Constitution because sexual conduct between married couples is exempted from its operation. There is nothing in the statute so stating. Therefore, there is no basis for his equal protection challenge.

## VI.
### Did the District Court Err in Instructing the Jury that Consent Was Not a Defense?

During the jury instruction conference, Defendant objected to any instruction having to do with the victim being unable to give informed consent. The district court instructed the jury that "it is not a defense to the crime of Sexual Abuse of a Vulnerable Adult that [the victim] may

9

have consented to the alleged conduct." As stated above, as a matter of law the victim was unable to consent to the sexual contact. Therefore, the district court did not err in giving this instruction.

## VII.
## Was the Jury Verdict Supported by Substantial and Competent Evidence?

Defendant contends that the jury verdict was not supported by substantial and competent evidence. Specifically, he argues that "the State failed to demonstrate that [the victim] was unable to protect herself from abuse because of her mental impairment." In support of this contention, Defendant states that the State's expert, a clinical psychologist, "testified that given [the victim's] intellectual capacity, if she was educated about sexual interaction, she had the cognitive ability to understand"; that "[t]he doctor thought with her mental health issues, she would be capable of making decisions regarding her welfare"; that the victim "is not mentally retarded"; and that she "successfully graduated Minico High School" where she received Bs and Cs in the more difficult classes, recognizing that her grades were above average in some of the regular course work.

"This Court will not overturn a judgment of conviction, entered upon a jury verdict, where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt." *State v. Sheahan*, 139 Idaho 267, 285, 77 P.3d 956, 974 (2003). "We view the evidence in the light most favorable to the prosecution, and we do not substitute our judgment for that of the jury regarding the credibility of the witnesses, the weight of the evidence, and the reasonable inferences to be drawn from the evidence." *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007). Evidence is substantial if a reasonable jury could have relied upon it in determining that the allegation was proved beyond a reasonable doubt. *State v. Anderson*, 145 Idaho 99, 103, 175 P.3d 788, 792 (2008).

The victim testified that she graduated from high school taking "[s]pecial ed resources class[es]," which "were, like, not, like, normal classes. They were for people that had learning disabilities." She stated that she tried to go to a community college after high school, "but I couldn't because I didn't understand the—the work." She stated that she had been living with

10

her mother before going to the psychiatric hospital, but that by the time of the trial she was living in an assisted living facility and her mother had been appointed her guardian.

The clinical psychologist testified that she conducted a psychological assessment of the victim in 2008 when she was previously an inpatient at the psychiatric hospital. She said that the victim's full-scale intelligence quotient was 72, which placed her in the borderline intellectual functioning range which goes from 70 to 79. That IQ meant that the victim's intellectual functioning was "below average, below low average, and is right on the edge of someone in the extremely low range." The psychologist further testified that the victim would have difficulty with decision-making capacity because her processing speed (how well a person can scan a situation and then make a decision about it) was very low, which would impact how quickly she can make decisions. The psychologist stated that the victim was slower in reasoning and that making a decision where there is a lot of information or a lot of things to consider would be quite challenging for her. With respect to the victim's ability to make sound decisions as to her welfare, the psychologist testified that it would depend upon the complexity of the decision. In terms of minor issues, the victim could decide what to eat, get her hand off a hot stove, and get out of the way of a car, but in terms of more complex situations it would be more challenging for her. According to the psychologist, it would be challenging for the victim to have to make a decision on the spot because her processing speed would make it difficult for her to weigh the benefits and the consequences of the decision at the time.

In addition, the jury saw the victim testify and could weigh how quickly she was able to answer questions, something not shown by a transcript. Defendant has failed to show that there was not substantial and competent evidence for the jury to conclude that the victim was a vulnerable adult.

## VIII.
### Did Sentencing Defendant for All Four Offenses Constitute Double Punishment for the Same Crime?

Defendant contends that sentencing him for all four crimes constituted double punishment for the same crime in violation of the Idaho Constitution. He did not object in the trial court to being sentenced for all four offenses. Therefore, he must show that the alleged error "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly

exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010).

Article I, § 13, of the Idaho Constitution provides that "[n]o person shall be twice put in jeopardy for the same offense." In contending that this provision was violated, Defendant relies upon this Court's decision in *State v. Major*, 111 Idaho 410, 725 P.2d 115 (1986). In *Major*, the issue was whether Major, an enrolled member in the Nez Perce Tribe, committed one or two crimes by possessing stolen property both on the reservation and off the reservation. *Id*. at 413, 725 P.2d at 118. In resolving that issue, the Court held that the test was "were the items possessed as a part of 'a single incident or pursuant to a common scheme or plan reflecting a single, continuing [criminal] impulse or intent . . . .' " *Id*. at 414, 725 P.2d at 119. Applying that test, the Court concluded "that Major committed but one offense of possession of stolen property." *Id*.

In adopting its test, the *Major* Court began its analysis by stating, "Whether a course of criminal conduct should be divided or aggregated depends on whether or not the conduct constituted 'separate, distinct and independent crimes.' " *Id*. (quoting from *State v. Hall*, 86 Idaho 63, 69, 383 P.2d 602, 606 (1963)). In *Hall*, the defendant was acquitted of conspiring with two others to commit a robbery in which the intended victim was killed. 86 Idaho at 64, 383 P.2d at 604. He was later charged with, and convicted of, committing the robbery. *Id*. at 66-67, 383 P.2d at 604. On appeal, he contended that his conviction violated the constitutional prohibition against double jeopardy in the Idaho Constitution, Article I, § 13. The *Hall* Court held that it did not violate the constitution because murder and robbery are separate and distinct crimes. "Neither is the 'same offense' as the other, within the constitutional provision against double jeopardy, and a prosecution for one does not bar a subsequent prosecution for the other on that ground." *Id*. at 69, 383 P.2d at 606.

The *Hall* Court then addressed whether the prosecution for the robbery violated Idaho Code section 18-301, "[o]ur statutory provision against double jeopardy." *Id*. at 74, 383 P.2d at 609. That statute provided:

> An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction

and sentence under either one bars a prosecution for the same act or omission under any other.

*Id*. at 74-75, 383 P.2d at 609. The Court noted that it had held that "this statute enlarges the scope of the constitutional provision against double jeopardy in that it prohibits double punishment 'for the same act or omission' and is not limited to the 'same offense.'" *Id*. at 75, 383 P.2d at 609. The Court then evaluated the facts and determined that the robbery and the murder did not arise out of the same act or omission because the robbery had been completed before the murder was committed. *Id* at 75, 383 P.2d at 609-10. Thus, the statement by the Court in *Major* that "Whether a course of criminal conduct should be divided or aggregated depends on whether or not the conduct constituted 'separate, distinct and independent crimes'" was based upon interpreting Idaho Code section 18-301, not upon the double jeopardy clause in the Idaho Constitution.

The next statement by the *Major* Court was, "This inquiry requires consideration of the circumstances of the conduct, *see State v. McCormick*, 100 Idaho 111, 115-16, 594 P.2d 149, 153-54 (1979) . . . ." 111 Idaho at 414, 725 P.2d at 119. The issue in *McCormick* was whether burglary, by entering the victim's residence during the nighttime with the intent to commit rape, and the ensuing rape "arose out of the same criminal conduct." 100 Idaho at 114, 594 P.2d at 152. The *McCormick* Court addressed whether they were the same offense under Idaho Code section 18-301. *Id*. at 115, 594 P.2d at 153. It noted that courts in California had followed the rule that "one committing burglary and another felony or larceny in one transaction was guilty of two crimes and could be sentenced for both," but in *People v. McFarland*[2] and *Neal v. State of California*[3] the California Supreme Court disapproved of the prior cases and "interpreted its statute, similar to I.C. § 18-301, as being dependent upon the intent and objective of the defendant, i.e., if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one." *Id*. The *McCormick* Court rejected interpreting Idaho Code § 18-301 in the same manner that the California Supreme Court interpreted its similar statute and held that "[a]lthough both crimes arose out of the same incident, each constituted separate 'acts' under I.C. § 18-301." *Id*. at 116, 594 P.2d at 154. Thus, the statement by the Court in *Major* that "This inquiry requires consideration of the circumstances of the

---

[2] 58 Cal.2d 748, 26 Cal.Rptr. 473, 376 P.2d 449 (1962).
[3] 55 Cal.2d 11, 9 Cal.Rptr. 607, 357 P.2d 839 (1961).

conduct" was based upon interpreting Idaho Code section 18-301, not upon the double jeopardy clause in the Idaho Constitution.

Finally, the *Major* Court stated the inquiry into whether criminal conduct should be divided or aggregated depends upon "consideration of the 'intent and objective of the actor.' *In re Ward*, 64 Cal.2d 672, 51 Cal.Rptr. 272, 275, 414 P.2d 400, 403 (1966) . . . ." 111 Idaho at 414, 725 P.2d at 119. Interestingly, *In re Ward* cited *Neal v. State of California* for the proposition that "[w]hether a course of criminal conduct is divisible and consequently gives rise to more than one act within the meaning of section 654 of the Penal Code is determined by the intent and objective of the actor." 64 Cal.2d at 676, 51 Cal. Rptr. at 275, 414 P.2d at 403. Thus, the *Major* Court decided to interpret Idaho Code section 18-301 in the same manner as the California Supreme Court had interpreted California Penal Code section 654 in *Neal v. State of California*, which is the same interpretation that this Court had expressly rejected in *McCormick*. Nevertheless, the *Major* Court's statement that whether criminal conduct should be divided or aggregated depends upon "consideration of the 'intent and objective of the actor' " was based upon interpreting Idaho Code section 18-301, not upon the double jeopardy clause in the Idaho Constitution.

Thus, the decision in *Major* was based upon the Court's interpretation of Idaho Code section 18-301, not upon its interpretation of the double jeopardy clause in the Idaho Constitution. Therefore, Defendant has failed to show that the alleged error violated one or more of his unwaived constitutional rights.

Idaho Code section 18-301 was repealed in 1995. Ch. 16, § 1, 1995 Idaho Sess. Laws, p. 22. Therefore, the analysis adopted in *Major* is no longer applicable for determining whether a criminal defendant can be sentenced for multiple crimes that were part of a single incident or pursuant to a common scheme or plan reflecting a single continuing criminal impulse or intent.

## IX.
## Conclusion.

We affirm the judgment of the district court.


Chief Justice BURDICK, Justices J. JONES, HORTON, and Justice Pro Tem WALTERS **CONCUR.**

14